AETNA INSURANCE COMPANY *et al.*, Plaintiffs-Appellees, *v.* 3 OAKS WRECKING AND LUMBER COMPANY, Defendant-Appellant.

First District (3rd Division)   No. 76-60

Opinion filed September 27, 1978.—Rehearing denied November 1, 1978.

O'Brien, Hanrahan, Wojcik & Conniff, of Chicago (John W. Purney and Robert S. Phillips, of counsel), for appellant.

Clausen, Miller, Gorman, Caffrey & Witous, P. C., of Chicago (John B. McCabe, James T. Ferrini, and Patricia N. Hale, of counsel), for appellees.

Mr. PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

On Sunday, June 15, 1969, a clear, hot, dry day, the building at 1406 South Indiana in Chicago caught fire. That building was being demolished by the defendant, 3 Oaks Wrecking and Lumber Company, a partnership (3 Oaks). The fire damaged two nearby buildings. The plaintiff insurers of those two buildings settled claims with their insureds and bring this action as subrogees. The jury returned verdicts for the plaintiffs totalling $94,200 and judgments were entered on those verdicts. The defendant appeals contending that the trial court was in error in refusing to direct a verdict in its favor and that there were numerous trial errors which require a new trial.

The complaint alleged that the defendant was negligent in its failure to secure the building against known dangers of fire presented by vagrants, and failure to provide a watchman to guard the building. In another count, one based on the theory of *res ipsa loquitur*, the plaintiffs charged that the building was in the exclusive control of the defendant and that fires do not ordinarily occur in buildings in which there is no source of energy or power in the absence of negligence by those in control of the building.

3 Oaks began their demolition in May 1969. The damaged buildings were located across an alley at 1407-11 South Michigan and at 1421-27 South Michigan. The first parcel was located directly to the west and the second parcel to the southwest of the defendant's building. The gas, electricity and water were shut off prior to the demolition. Acetylene and oxygen, the fuel for acetylene torches, were kept under lock and key at all times.

According to Augustin Riccio, a partner in 3 Oaks, it was a custom in the industry, which he characterized as an unwritten law, to lock up buildings which were in the course of being demolished. The usual procedure was to board up the windows and nail the doors to the building as soon as the wrecker took possession. The witness purchased four locks and gave them to his brother Lawrence Riccio who was in charge of the equipment and the men on the jobs. It was his responsibility to see that the building was locked at the end of the first day of wrecking. Thereafter, it became the duty of the last superintendent to leave the job to see that the doors and other openings to the building were locked up at night. The building had to be secured at all times. No one at 3 Oaks testified that the building was in fact locked before the fire.

Augustin Riccio testified that normally 3 Oaks removes salvage from the job before beginning actual demolition. The purpose of this is to acquire cash and to keep vandals away from the building under demolition. At the time of the fire 90% of the lumber salvage and 5% of the metal salvage was still in the building. Security was necessary because of the character of the neighborhood. The area was near "south skid row" and alcoholics were present. There were also hoboes who would ride trains out at the nearby Illinois Central Railroad yard. Those people tried to get into the buildings to sleep, and they would smoke and cook in the buildings if they could. Fire scavengers had gained entrance to the building and at least on one occasion had removed copper. Although all acetylene and oxygen was under lock and key at all times it would not take much for a professional thief to carry an acetylene torch and to cut the lock with a bolt cutter. Of the 20,000 buildings 3 Oaks had demolished there had been only two or three fires.

Augustin Riccio further testified that at the time of the fire the actual demolition had not progressed very far. The top two floors had been removed and a big hole had been torn out of the south side of the building which was likened to a scooped-out opening in the wall. Several thousand board feet of lumber were piled on top of the remaining floor of the building awaiting removal.

Across the alley to the north was a fire station located at 1401 South Michigan. Fireman Thomas Doyle worked at that station. He testified that it was the department's policy to check the buildings such as this for

hazards so that firemen would not get hurt in the event there was a fire at night. Doyle made these checks at about 7 p.m. after the demolition had stopped for the day. He was able to enter the building by just opening the door of the barricade and walking in. There was neither a lock nor a hasp on the door. Doyle was last in the building approximately three or four days before the fire.

John Emmons resided in the building located at 1421 South Michigan. He testified that a door at the northwest corner of the building remained open at all times. His cat went into the building and he went in to look for it. He testified that the door was open a day or two before the fire and it was open the day of the fire. Emmons' attention was drawn to the fire by his wife who smelled smoke. He observed a swirl of smoke and then suddenly it was like an explosion and the whole building was on fire. He called the fire department and then began to wet down the roof of his building until fire equipment arrived.

Carl Baldascarra, a fire protection engineer, after viewing the photograph of the early stages of the fire, testified that the burning must have been very intense with the whole structure involved.

Thomas Nelson, a fire insurance adjuster, testified that after the fire Lawrence Riccio stated that night watchman was present as a rule but that on the night of the fire the watchman was off. Lawrence Riccio also said that they had trouble with transients coming in and building fires in the building next door.

The defendant argues that as a matter of law the defendant owed no duty to the plaintiffs. It cites *Cunis v. Brennan* (1974), 56 Ill. 2d 372, 308 N.E.2d 617, *Mieher v. Brown* (1973), 54 Ill. 2d 539, 301 N.E.2d 307, and *Stribling v. Chicago Housing Authority* (1975), 34 Ill. App. 3d 551, 340 N.E.2d 47, generally for the proposition that the question of duty is one of law. It emphasizes that portion of those opinions referring to two elements considered in ascertaining if a duty exists, that is, the "unreasonable danger" or "unreasonable risk of harm" (*Cunis*, at 377) and "remote possibility" (*Cunis*, at 377-78) or "mere possibility" (*Stribling*, at 555) of the occurrence. There is no question that those cases stand for those propositions but their applicability to this case is not apparent. The factual situations in *Mieher* and *Cunis* are not argued. It is argued, however, that *Stribling* is similar and there the court found that the landlord owed no duty to guard against the original burglary. In *Stribling* the plaintiffs were residents in a housing project. For some time the two apartments on either side of the plaintiff's apartment were vacant. The plaintiff noticed persons entering and leaving and heard noises coming from inside both apartments. The plaintiff advised the defendant's agent about the circumstances, but no action was taken. Subsequently, the plaintiff's apartment was broken into on three separate occasions by

breaking holes through the walls of the vacant apartment to gain access to the plaintiff's apartment. The appellate court affirmed the dismissal of the first count emanating from the first entry into the apartment and reversed the dismissal of the counts emanating from the second and third entries. The *Stribling* court concluded that under the "bizarre" facts in the complaint the Chicago Housing Authority had no duty to guard against the original burglary. However, after receiving notification of that burglary and the means by which it was accomplished the court stated that "the fact that another burglary could happen in the same fashion became eminently foreseeable." *Stribling,* at 556.

■■ Circumstances in the case at bar can hardly be considered extraordinary or bizarre. Augustin Riccio testified that security was necessary because of the character of the neighborhood. The neighborhood was located in an area in which people tried to enter buildings to sleep and in doing so they would smoke and cook in the buildings if they could. Scavengers also sought entrance into the buildings to remove copper. Nelson testified that Augustin Riccio told him that they had trouble in the building right next door with transients seeking entry into the buildings and starting fires. The defendant's contention that no duty exists because it was not shown that there was an unreasonable danger or an unreasonable risk of harm and that this occurrence was only a remote possibility or mere possibility is not borne out by the evidence.

In a similar vein the defendant argues that the defendant's conduct was not foreseeable. It cites *Donehue v. Duvall* (1968), 41 Ill. 2d 377, 243 N.E.2d 222, *Driscoll v. C. Rasmussen Corp.* (1966), 35 Ill. 2d 74, 219 N.E.2d 483, and *Anderson v. Yellow Cab Co.* (1975), 28 Ill. App. 3d 656, 329 N.E.2d 278. These cases are factually dissimilar and not instructive except to state that an injury is not actionable unless reasonably foreseen. As we indicated in considering the duty issue, we believe the occurrence was not remote nor only a mere possibility. The event was foreseeable.

■■ The defendant next asserts that the plaintiff introduced no evidence whatsoever that the defendant was negligent. It insists that there was absolutely no evidence that any unauthorized person had been on the premises or in the building at the time the demolition started to the date of the fire. The lack of evidence, it contends, defeats both the specific negligence and the *res ipsa loquitur* counts. We cannot accept that contention. Considering the negligence count first, there is evidence that the building was open and that Doyle, the fireman, and Emmons, a neighbor, were able to walk into the building unhampered. On previous occasions some copper had been stolen from the building. The neighborhood was frequented by hoboes and intoxicated persons looking for a place to sleep and to cook food. There is no source of energy or power in the building. The fire started on a clear, hot, dry day. This

provides abundant circumstantial evidence to give an instruction on the issue and from which the jury might conclude that the failure to safeguard, lock or barricade the premises properly allowed vandals and vagrants and other unauthorized persons on the premises and that those persons started the fire.

■■ In urging that the *res ipsa loquitur* count is insufficient the defendant cites *Hahn v. Eastern Illinois Office Equipment Co.* (1976), 42 Ill. App. 3d 29, 355 N.E.2d 336, as being factually applicable. In *Hahn* the fire occurred in the defendant's building and spread to the plaintiff's building next door. The suit was based on a *res ipsa loquitur* theory. The defendant had left the building in the middle of a Saturday afternoon and the fire started early Sunday morning. The defendant introduced testimony that the fire started in the motor of a basement furnace. The court there noted that in order for the doctrine to be applicable it was necessary that the accident be of a kind which does not ordinarily occur in the absence of someone's negligence and that the instrumentality which causes the injury must be in the exclusive control of the defendant. Addressing itself to the issue as to whether this accident was the kind which does not ordinarily occur in the absence of someone's negligence the court said "only when the fact of the fire plus the surrounding circumstances give rise to an inference of negligence that res ipsa loquitur is applicable." (*Hahn*, at 31.) The court held that it was established that the fire originated in the defendant's furnace and it was not established if there were other circumstances which could raise an inference of negligence. (*Hahn*, at 32.) In the case at bar, the nature of the neighborhood, the fact that the doors were open, copper had been stolen, the problems with vandals in the building next door, the fact that there was no source of energy or power, and the fact that the event occurred on a clear, dry day were circumstances that do give rise to an inference of negligence.

The defendant cites numerous alleged trial errors. It states that the court erred in refusing to allow it the right to review and examine Nelson's notes and files for purposes of cross-examination. Nelson had testified he had reviewed all the files before he came into court and that these files refreshed his recollection. He did not have the files with him in court. He also testified that the documents he looked at on the stand and which were in evidence were sufficient to refresh his recollection. Further, the document that was in court was the only one he examined to refresh his recollection as to the conversation with Augustin Riccio. The court denied the defendant the right to examine Nelson's files which were examined by him before he came into court to testify and which were not in court at the time that he testified.

In *People v. Scott* (1963), 29 Ill. 2d 97, 193 N.E.2d 814, the supreme court had occasion to consider the right of access to a writing used by the

witness to refresh his recollection prior to the time that the witness took the stand. The witness in *Scott* did not use any memoranda to refresh his recollection while on the stand or in the courtroom, but the preceding evening and earlier that morning he had gone over a "captain's report." The *Scott* court said:

> "Had reference been made by the officer to the captain's report during his testimony for purposes of refreshing his recollection, we assume no question could be raised as to the necessity for its exhibition to defense counsel for his examination and use during cross-examination. We see no substantial or logical difference between that situation, and the one where the witness examines the refreshing document prior to stepping into the courtroom. The opportunity for mischief or error is equally present regardless of where or when the inspection of the document occurs. As Wigmore states: 'For though there is no objection to a memory being thus stimulated, yet the risk of imposition and the need of safeguard is just as great.' (3 Wigmore on Evidence, 3rd ed., sec. 762, p. 111.)" *Scott*, at 111.

The plaintiffs assert that the defendant had no absolute right to have any material produced for inspection at trial and that it is within the sound discretion of the trial judge to refuse to permit such an inspection. That view is consistent with *Cole v. Brundage* (1976), 36 Ill. App. 3d 782, 344 N.E.2d 583. In *Cole* the court said that production is largely within the court's discretion. The *Cole* court relied on *Goldman v. United States* (1942), 316 U.S. 129, 132, 86 L. Ed. 1322, 1326, 62 S. Ct 993, where the court said,

> "We think it the better rule that where a witness does not use his notes or memoranda in court, a party has no absolute right to have them produced and to inspect them."

Rule 612 of the Federal Rules of Evidence (Fed. R. Evid. 612) adopts this position also, relying on *Goldman*. See Historical Note and Notes of Advisory Committee on Proposed Rules.

■■ We believe, as the *Cole* court did, that the trial court has discretion in this matter. We believe this position to be consistent with *Scott* where the rationale was that the opportunity for "mischief or error" should be obviated regardless of where the person examined the documents. However, as was pointed out in the Historical Notes and the Notes of the Advisory Committee on the Proposed Rules, that discretion is necessary to safeguard against using the rule as a pretext for a wholesale exploration of an opposing party's files during trial. The court's discretion can insure that access is limited only to those writings which may fairly be said in fact to have an impact upon the testimony of the witnesses. As applied to the case at bar we do not believe that the court abused its discretion. A

substantial amount of the cross-examination of Nelson concerns the statement of Augustin Riccio. Nelson's notes for that statement were present in court.

■■ The defendant asserts that it was error for the trial court over objection to allow Newberger Edwards, a construction inspector for the city of Chicago, to read two city ordinances and a certain portion of the American Standard Safety Code which was admitted into evidence. Subsequently, the court determined that one of the ordinances and the American Standard Safety Code applied only to construction and not to demolition, advised the jury of that and withdrew the American Standard Safety Code from evidence. Any error in the reading of the one ordinance or in the reading and the withdrawing of the ordinance and the American Standard Safety Code can be only deemed harmless error.

The defendant further asserts that it was error for Newberger Edwards to testify that the purpose of the building code was to safeguard people and property at the time of the demolition or erection of buildings. The defendant contends that the rule of law in Illinois has long been established that witnesses are not allowed to testify as to the meaning or purpose of statutes or ordinances. It cites the case of *National Fire Insurance Co. v. Hanberg* (1905), 215 Ill. 378, 74 N.E 377. There, the witness testified as to the meaning of the term "net receipts" in a section of a statute as it was understood among insurance experts. In the case at bar the witness did not construe the terms of the statute. He merely stated the rather obvious fact that this statute was designed to safeguard people and property.

The defendant contends that it was error for the trial court to give an instruction stating that there was an ordinance which provided that in the wrecking, demolishing or razing of any building, work shall begin at the top and each story shall be completely razed or demolished and the material removed before the beginning of the work on the next lower story. The instruction further provided that if the jury found that a party violated the ordinance they could consider that fact together with all the other facts and circumstances in evidence in determining whether or not a party was negligent before and at the time of the occurrence. The defendant contends that the violation of a safety ordinance is only *prima facie* evidence of negligence and creates a cause of action only if it is the proximate cause of the injury. The plaintiffs reply that Walter Peterson, a fireman, testified that prior to the fire the front of the building had been taken out and he could observe the interior portion of the building. He said that the front part of the structure was missing but the rear part was still there "something like a dollhouse." Lawrence Riccio testified that lumber from the demolished floors had been piled on the top floor of the building and that only 10% of the lumber had been removed while 90%

remained piled on the top floor. Baldascarra, the fire protection engineer, testified that the reason that wrecking progresses one floor at a time rather than by sections of floors is that it prevents the rapid spread of flame. He stated that if the top two floors are only partially removed the walls are open and the fire can spread from one floor to another with greater rapidity due to the lack of masonry walls.

■■ The evidence presented amply demonstrates that there was evidence that the demolition did not begin at the top and that each story was not completely demolished and material removed to show a violation of the ordinance. There was also evidence to show that this violation contributed to the intensity of the fire and was a proximate cause of the plaintiff's damages.

■■ The defendant also claims that there was no evidence to support the giving of the instruction that charged the defendant with negligence in failing to provide a watchman for the purpose of guarding the building. The defendant contends that there is no evidence that a watchman could have prevented the fire from starting. We believe that the jurors who were instructed that they were not required to set aside their own observation and experiences in the affairs of life has a right to infer that a watchman could have prevented the fire and that failure to provide a watchman to guard the building was a proximate cause of the plaintiff's damages.

The defendant asserts that the trial court erred in admitting into evidence certain items of damages without proper foundation and in denying the defendant's motion to strike certain evidence and items relating to damages. The defendant urges that there was no proof of damages as to the buildings. It contends that the plaintiff failed to prove that the buildings were in good condition before the fire and their value before the fire. Cited as authority for the necessity of these items is *Lucas v. Bowman Dairy Co.* (1964), 50 Ill. App. 2d 413, 200 N.E.2d 374. The *Lucas* case considered damages with regard to furniture that had been repaired. The court said the rule of damages applicable is the difference in value immediately before and immediately after the occurrence. (*Lucas*, at 416.) The instant case is inapposite because the buildings were repaired. Damages for injury to real property is the cost of the repair or restoration. (*Peluso v. Singer General Precision, Inc.* (1977), 47 Ill. App. 3d 842, 365 N.E.2d 390.) Nelson testified as to the cost of repairs. The defendant's contention on this point is not well taken.

■■ The defendant makes a similar contention concerning the damages sustained by Northwestern Manufacturing Co. It suggests that nowhere did the owner testify as to the fair market value of the property before the fire or to the condition of the goods before the fire. Where there is less than total destruction of personal property the measure of damages is the difference between the reasonable value of such property before and

after the damage. (*Behrens v. W. S. Bills & Sons, Inc.* (1972), 5 Ill. App. 3d 567, 576, 283 N.E.2d 1.) Nelson, who possessed 38 years of adjusting experience and was familiar with the soft goods market and values in the Chicago area during 1969, gave an opinion that the change in market value was $37,527. A similar argument is made concerning the damages to Reinganum Co. There, Reinganum testified as to values and that his damages were $22,721. We believe that the testimony of Nelson and Reinganum was sufficient to place those damages before the jury.

Also on the damage issue the defendant contends that certain exhibits were improperly admitted. The evidence in this regard is merely cumulative and any error certainly does not warrant a reversal on the issue of damages.

The defendant claims that it was prejudiced by the court's abuse of its discretion in allowing four witnesses not named in answers to interrogatories to testify. Emmons, the resident in the building located at 1421 South Michigan, testified about the progress of the demolition and of the fact that the door was open at the northwest corner of the building. He was listed in the fire department report as the party who turned in the original alarm. Doyle, a fireman at the fire station at 1401 South Michigan, also testified about the doors. Counsel for the defendant made an objection to his testimony. The court stated that counsel would be given an opportunity to interview him before he took the witness stand. The defendant stated that he would rather have the witness excluded, but he would take the opportunity to interview the witness which he did. Edwards was subpoenaed to bring the building code of the City of Chicago. Counsel for the plaintiff at trial was not familiar with the witness until 10 minutes before he took the witness stand. Baldascarra testified as an engineering expert. The record indicates he was retained to testify after the defendant made a request for a list of witnesses.

■■ In *Buckler v. Sinclair Refining Co.* (1966), 68 Ill. App. 2d 283, 290, 216 N.E.2d 14, the court said the question of the appropriate sanction, if any, where an undisclosed witness is called to testify, was within the discretion of the trial court. In exercising that discretion the court stated that some of the criteria are: surprise to the opposing party; the good faith of the party calling the witness to notify the opposing party; equal opportunity and access of the opposing party to interview or depose the witness prior to trial; and the prejudice resulting from the testimony. In light of the facts in this case and considering the factors that the court should take into account in exercising its discretion we do not believe that the trial court abused its discretion in allowing the testimony of the witnesses.

The defendant finally argues that the plaintiffs' expert, Carl Baldascarra, was allowed to testify why statutes and ordinances were

passed and the meaning and purposes of the statutes and that his opinion was based on guess or conjecture. The witness was asked if he knew why wrecking was supposed to progress one floor at a time. He answered that it was to maintain the structural integrity of the building and to prevent the rapid spread of flame from one area to another. He also testified that the reason that the holes in the floor of a building were covered was to prevent the spread of fire from one floor to another. We do not believe that this testimony is properly characterized as commenting on the reason why statutes and ordinances were passed nor on the meaning or purposes of the statutes or ordinances.

■■ The defendant's argument that Baldascarra's opinion was based upon guess or speculation apparently stems from the fact that the witness testified that the uncovered openings in the floor caused a faster spread of the fire. The defendant in the trial court did not object to the lack of factual basis for the asking of that question nor is one suggested here on appeal. The answer to the question was within the expertise of the witness.

The judgment of the circuit court of Cook County is affirmed.

Affirmed.

McNAMARA and SIMON, JJ., concur.